Filed 5/28/25 P. v. Valdivia CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FERNANDO VILLANUEVA VALDIVIA,<br><br>    Defendant and Appellant. | B332634<br><br>Los Angeles County<br>Super. Ct. No. KA027737<br><br>**ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION**<br><br>**[No Change in Judgment]** |

THE COURT:

The opinion in the above-entitled matter filed on May 1, 2025, is modified as follows.

1.  At page 4, line 6, delete the sentence that begins with "The prosecutor told Valdivia that . . ." and replace with:
    The prosecutor told Valdivia that, if he was not a United States citizen, he "would" be[3] deported, excluded from the United States, or prevented from becoming a citizen, as a result of a guilty or no contest plea.

_____

[3]     The minute order from the March 20, 1996 plea hearing states that Valdivia was told his plea "may" result in deportation,

2. At page 11, Discussion, part III.A., second paragraph, delete the second sentence that begins with "The reporter's transcript of the March 20 hearing . . ." and replace with:

The reporter's transcript of the March 20 hearing confirms that Valdivia was unambiguously informed he *would* be deported, excluded or barred from citizenship as a result of pleading no contest.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

LUI, P. J.       ASHMANN-GERST, J.      RICHARDSON, J.

_____

exclusion or denial of naturalization. We rely on the reporter's transcript of the plea hearing showing Valdivia was informed that his plea "would" lead to these consequences.

Filed 5/1/25  P. v. Valdivia CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>FERNANDO VILLANUEVA VALDIVIA,<br><br>      Defendant and Appellant. | B332634<br><br>(Los Angeles County Super. Ct. No. KA027737) |

APPEAL from an order of the Superior Court of Los Angeles County, Juan Carlos Dominguez, Judge. Affirmed.

Christopher L. Haberman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

In 1996, defendant Fernando Villanueva Valdivia pleaded no contest to possessing cocaine base for sale and destroying evidence, and was sentenced to three years' probation and time served. In 2023 he moved to set aside his plea, asserting he did not understand that his plea exposed him to deportation, exclusion from the United States and denial of citizenship. Valdivia now appeals from the order denying his motion, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Valdivia's Two Pleas

On December 22, 1995, Valdivia and his counsel, Antonio Bestard, attended a hearing in the superior court. Valdivia was charged with possession of marijuana for sale (Health & Saf. Code, § 11359; count 1), possession of cocaine base for sale (Health & Saf. Code, § 11351.5; count 2), and destroying evidence (Pen. Code, § 135[1]; count 3). Valdivia pleaded not guilty to count 1 and no contest to count 2. Valdivia was advised that, if he was not a United States citizen, his plea may lead to his being deported, excluded from re-entry into the United States and denied citizenship.[2] On January 12, 1996, for reasons that do not appear in the record, the court heard and granted the prosecution's motion to set aside Valdivia's guilty plea.

---

[1]     Further undesignated statutory references are to the Penal Code.

[2]     The minute order dated December 22, 1995, states that Valdivia was informed his plea "may" lead to deportation, exclusion and denial of citizenship. The record does not include a reporter's transcript showing the exact language of the warning Valdivia received on that date. (See fn. 3, *post*.)

On March 20, 1996, Valdivia (along with codefendants Nicolas Villanueva and Maria Garibay, Villanueva's wife) was charged in a second amended information with possession of cocaine base with intent to sell (Health & Saf. Code, § 11351.5; count 2) and destroying evidence (Pen. Code, § 135; count 3). At a plea hearing that morning Villanueva's counsel, who was standing in for Valdivia in Bestard's absence, described Valdivia's situation in response to a question from the court. "Mr. Valdivia had previously agreed to a six months sentence and what—he was hung up apparently on a couple of points. [¶] I thought the major point, that it had to be a package plea for Mr. Villanueva. And when Mr. Villanueva backed out, Mr. Valdivia couldn't get out on his hundred eighty day plea until Mr. Villanueva's matter was resolved. [¶] The district attorney tells me today it also went to the heart of a statement of fact."

The March 20, 1996 plea hearing focused on a plea deal for "the least possible harm" to Garibay, which Villanueva insisted on before he would agree to his own deal. The dominoes quickly began to fall once Garibay agreed to 90 days Caltrans work in lieu of 180 days in county jail, after which Villanueva agreed to his previously negotiated deal. Once Garibay's and Villanueva's deals were resolved, the district attorney informed the court, "And Mr. Valdivia basically has time served at this point." The court ordered counsel to prepare plea forms and to return at 2:30 that afternoon.

Bestard, assisted by a Spanish interpreter, was present at the afternoon session. In response to the prosecutor's questions, Valdivia confirmed that he wanted to plead to count 2, possession for sale of cocaine base. Valdivia also confirmed the terms of his agreed sentence, three years' probation and 201 days in county

jail, with credit for 201 days served. He stated on the record that he had sufficient time to discuss the case with his attorney, and that he understood the charges against him and the maximum possible sentence if convicted. The only question Valdivia asked was for the prosecutor to repeat the maximum sentence if he was convicted at trial. The prosecutor told Valdivia that, if he was not a United States citizen, he "would" be[3] deported and excluded from the United States, and prevented from becoming a citizen, as a result of a guilty or no contest plea. Asked by the prosecutor, Valdivia confirmed that he understood. Valdivia pleaded no contest to counts 2 and 3 and was sentenced to the agreed term.

## II. Valdivia Moves to Set Aside His Conviction

On February 16, 2023, Valdivia filed a motion to withdraw his no contest plea pursuant to section 1473.7. In support of his motion he submitted his declaration in Spanish with an accompanying English translation, a declaration from immigration law attorney Araceli Perez-Brizo, three "character letters" from relatives and friends, and the reporter's transcript of the plea hearing on March 20, 1996.

Valdivia stated in his declaration that he left a small town in Mexico, where he lived in poverty and with little opportunity. He was "young" at the time of his crimes, did not understand English and was not familiar with the legal system in this country. Although he was charged with possession of drugs, the

---

[3] The minute order from the March 20, 1996 plea hearing states that Valdivia was told his plea "may" result in deportation, exclusion or denial of naturalization. We rely on the reporter's transcript of the plea hearing showing Valdivia was informed that his plea "would" lead to these consequences.

quantity "was a very small amount" that "a reasonable person could conclude . . . was for personal use."

Valdivia's declaration only discussed the March 1996 plea hearing. According to Valdivia, Bestard never raised the topic of immigration, residency or nationality. He asserted, "Mr. Bestard never bargained with the district attorney for an alternate charge or offer that did not have immigration consequences." When Valdivia asked about possibly pleading to a lesser charge, Bestard's response was "something to the effect of, this is the charge, you can't plead [guilty] to anything else."

Valdivia further asserted Bestard never spoke to Valdivia "about the plea deal as it related to immigration consequences or have any discussion regarding the long term immigration implications" of the proposed plea deal, and "never informed me that this conviction would lead to certain deportation from the U.S. and complete disqualification from any form of immigration relief." Valdivia asserted he did not understand any warnings he received because they were in English. Even the Spanish interpreter was no help because "the advisements were provided at the 11th hour, and I did not have time to process and understand them."

Finally, Valdivia asserted that had he been advised "of the devastating immigration consequences" of the plea deal he accepted, "I would NOT have accepted the plea offer because retaining the ability to remain in the United States was and is the most important thing at the time." He also declared he had developed "strong ties to the community" at the time of his arrest, and he wanted to remain in the United States in order to provide for his son and his parents.

## II.    The Trial Court Hears, and Denies, Valdivia's Motion

The trial court held an evidentiary hearing on Valdivia's motion on June 5, 2023. Valdivia did not testify and submitted on his declaration. Called to testify by the prosecution, Bestard contradicted much of what Valdivia asserted in support of his motion. For example, Bestard testified that he spoke Spanish and was able to communicate with Valdivia in that language. He also testified that in his absence from the morning session of the March 1996 plea hearing, codefense counsel, who did not speak Spanish, was able to converse with Valdivia in English. Bestard testified that he filled out the *Tahl*[4] waiver form and reviewed every line in the form with Valdivia, assisted by the Spanish interpreter.

Bestard took issue with Valdivia's assertion that the immigration consequences of the proposed plea deal were only presented at the 11th hour, or that Valdivia was pressured into making a hasty decision. Bestard testified that he discussed the plea deal with Valdivia for 30 to 40 minutes. He also testified that he told Valdivia that if he went to trial and was convicted, the result might be a prison sentence. Bestard denied Valdivia's assertion he had not discussed the immigration consequences of the proposed plea deal.

In response to a question from the court, Bestard testified that the immigration consequences of pleading guilty to possession of cocaine base was "a gray area" at the time of Valdivia's plea. Bestard informed Valdivia that he "would" be subject to removal and exclusion as a result of his plea, and the

---

[4]    *In re Tahl* (1969) 1 Cal.3d 122, 132.

6

commissioner presiding over the hearing also informed Valdivia he "would" face deportation and exclusion.

Bestard testified that he, along with other defense counsel, discussed alternative charges with the district attorney's office. He also testified that he raised the possibility of Valdivia pleading to simple possession. Valdivia was "anxious to get out of custody" and was "anxious" to resolve his case "so he could get out."

After taking the motion under submission, the court issued a written notice of decision denying the motion on the ground that Valdivia's declaration "lacks credibility as it is misleading on many important points." In a series of numbered paragraphs, the court highlighted portions of Valdivia's declaration it found were inconsistent with the record. For example, in response to Valdivia's assertion that his attorney never discussed potential immigration consequences of a guilty or no contest plea, the court found that "Mr. Bestard credibly testified that he advised the defendant of the potential immigration consequences." Although Valdivia asserted that the admonishment given by the prosecutor "was not clear that [Valdivia] would in fact be deported," the court found instead that "[t]he District Attorney advised defendant that he 'Would be Deported' instead of 'May be Deported' . . . . By virtue of the use of the word 'Would,' the defendant was told that his deportation was in fact a certainty." The court also took issue with Valdivia's insistence that Bestard failed to bargain for a better disposition, finding instead that "the topic of bargaining in fact took place up to the last minute when both the District Attorney and, most importantly the court, indicated that the offer was 'as good as it was going to get.' "

The court also disagreed with Valdivia's characterization of his crime as involving only a "small amount" of drugs that a "reasonable person" might believe was consistent with "personal use." The court instead reviewed the facts showing that, after receiving a tip about drug trafficking, deputies conducted surveillance and "documented traffic consistent with narcotic sales" as well as purchasing cocaine themselves. When they served a search warrant, deputies observed Valdivia "handing plastic baggies containing a white substance to a female co-defendant who stuffed the baggies in the kitchen sink drain and turned on the garbage disposal," after which deputies retrieved "torn plastic baggies and several white rock-like substances which tested positive for cocaine."

Finally, the court was not persuaded by Valdivia's assertion that, at age 23, he was unfamiliar with the justice system in the United States and was unaware of the adverse immigration consequences he was facing. Instead, the court observed that Valdivia had no legal status and "could simply be deported for being in the country without documentation." Under the circumstances, the court found instead that "[a]ny reasonable individual in the shoes of the defendant [] had to have known that a criminal conviction for a drug trafficking offense would be devastating to his ability to remain in and obtain lawful status in the United States." The court afforded little weight to Valdivia's assertion he had formed strong ties to the community, noting instead that Valdivia "submitted no evidence of how long he had been in the United States prior to his arrest and what ties to the community he may have formed."

Valdivia filed a timely notice of appeal from the June 9, 2023 order denying his motion.

**DISCUSSION**

## I. The Legal Standard

Valdivia's conviction for violating Health and Safety Code section 11351.5 made him subject to removal and exclusion from the United States under federal immigration law. Effective January 1, 2017, the Legislature adopted section 1473.7, which provides in pertinent part that "[a] person who is no longer in criminal custody may file a motion to vacate a conviction or sentence" that is "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).) The statute further provides that a court "shall" vacate a conviction or sentence upon a showing, by a preponderance of the evidence, of prejudicial error. (*Id.,* subd. (e)(1).) The focus of the inquiry is on the "defendant's own error in . . . not knowing that his plea would subject him to mandatory deportation and permanent exclusion from the United States." (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1009 (*Camacho*).)

## II. Standard of Review

In *People v. Espinoza* (2023) 14 Cal.5th 311 (*Espinoza*), our Supreme Court held that a party seeking relief under section 1473.7 must satisfy a two-part test. "The defendant must first show that he did not meaningfully understand the immigration consequences of his plea." (*Espinoza,* at p. 319.) If he establishes that lack of understanding, the defendant must then show his misunderstanding constituted prejudicial error, which " 'means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had

9

correctly understood its actual or potential immigration consequences.' " (*Ibid.*; quoting *People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*).) Valdivia's decision to plead no contest is " ' "viewed at the time of the offer. . . ." ' " (*People v. Martinez* (2013) 57 Cal.4th 555, 564 (*Martinez*).)

We independently review whether Valdivia proved, by a preponderance of the evidence, that he did not understand the immigration consequences of his no contest plea to violating Health and Safety Code section 11351.5. (*Espinoza, supra,* 14 Cal.5th at p. 319.) If we find he proved lack of understanding, we then independently review whether his lack of understanding constituted prejudicial error. (*Id.* at p. 321.) "When courts engage in independent review, they should be mindful that ' "[i]ndependent review is *not* the equivalent of de novo review . . . ." ' [Citation.] An appellate court may not simply second-guess factual findings that are based on the trial court's own observations." (*Vivar, supra,* 11 Cal.5th at p. 527.) Instead, "[w]hen courts engage in independent review, they must give deference to the trial court's factual determinations if they are based on ' " 'the credibility of witnesses the [superior court] heard and observed.' " ' " (*Espinoza, supra,* at p. 320; *Vivar, supra,* at pp. 527-528 ["In section 1473.7 proceedings, appellate courts should . . . give particular deference to factual findings based on the trial court's personal observations of witnesses"].) "But when the trial court's findings 'derive entirely from written declarations and other documents,' the trial court and the reviewing court ' "are in the same position," ' and no deference is owed." (*Espinoza*, at p. 320.) Here, the trial court concluded Bestard was a credible witness after observing his testimony, and determined Valdivia's declaration was not credible. Consistent

with *Espinoza* and *Vivar*, we defer to the trial court's finding that Bestard testified credibly, and we review the record independently to assess the credibility of Valdivia's declaration.

III. **Valdivia Did Not Establish, by a Preponderance of the Evidence, That He Did Not Understand the Immigration Consequences of His Plea**

A. **Valdivia's Declaration Is at Odds With the Record**

Addressing Valdivia's declaration, we begin by noting he omits any reference to his first plea deal in December 1995. The minute order from the December 1995 plea hearing shows that Valdivia was charged with not one but two Health and Safety Code violations, but was allowed to plead no contest to only the charge of possessing cocaine base for sale. This suggests that Bestard was bargaining on Valdivia's behalf months before March 20, 1996, and corroborates Bestard's testimony to that effect. The December 1995 minute order also shows that Valdivia was warned of immigration consequences resulting from his plea, which casts doubt on his assertion that the immigration consequences of pleading no contest were not called to his attention until the March 20, 1996 plea hearing.

Valdivia's version of the events of March 20, 1996, is not only at odds with Bestard's testimony, but with the record of that hearing as well. The reporter's transcript of the March 20 hearing confirms that Valdivia was unambiguously informed he *would* be deported, excluded and barred from citizenship as a result of pleading no contest. When asked by the prosecutor, Valdivia affirmed that he had discussed the charges with Bestard, that he had had adequate time to do so, and that he understood the consequences of his plea. Throughout, he had the assistance of a

11

Spanish-language interpreter as well as Spanish-speaking counsel. We agree with the trial court that Valdivia's declaration does not establish, by a preponderance of the evidence, that Valdivia was not advised of the consequences of pleading no contest, or that he was advised but did not understand the warnings given him.

### B. Valdivia's Declaration Is Uncorroborated

The next step in our independent review is whether other evidence accompanying Valdivia's declaration corroborates his assertion that he would never have accepted a plea deal that could lead to his deportation and exclusion from this country. "[W]hen a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with ' "objective evidence." ' " (*Vivar, supra,* 11 Cal.5th at p. 530; *Espinoza, supra,* 14 Cal.5th at p. 316 [same].) Examples of such corroborating "objective evidence" include evidence of Valdivia's ties to the United States, whether Valdivia had reason to believe an immigration-safe plea bargain was possible, and the probability of obtaining a more favorable outcome if he rejected the plea and went to trial. (*Espinoza*, at p. 320.) We address Valdivia's evidence supporting each of these factors.

"A defendant's deep and long-standing ties to the United States are among the totality of circumstances that can support an inference that immigration consequences were of paramount concern at the time of the defendant's guilty plea." (*Espinoza, supra,* 14 Cal.5th at p. 323.) The defendant in *Vivar*, for example, was a legal permanent resident who had arrived in the United States at age six. (*Vivar, supra,* 11 Cal.5th at pp. 517, 530.) He had learned English, attended local schools, and participated in a

12

junior officer training program in the hope of following an older sibling into the United States military. (*Id.* at pp. 518, 530.) The defendant in *Espinoza* had come to the United States at age 13 and had lived in California for 23 years. He had a wife and five children who were United States citizens, his parents and siblings lived in this country, and he was the financial provider for his extended family. "He ran his own business to provide for his family[,] [h]e volunteered, went to church, and took part in numerous community organizations." (*Espinoza*, at p. 323.) The defendant in *People v. Lopez* (2021) 66 Cal.App.5th 561 (*Lopez*), was a legal permanent resident of the United States at the time of his arrest. Lopez's immediate family lived in the United States, including his parents and his four children, all of whom were citizens. (*Id.* at p. 569.) Lopez was also the sole source of support for his girlfriend and one of his minor children. (*Ibid.*)

By contrast, Valdivia provided almost no evidence to support his assertion that he had formed strong "community ties" at the time he entered his plea. Valdivia had no legal status in the United States at the time of his arrest. There is no evidence of when he arrived in the United States, other than his counsel's statement that "Mr. Valdivia had been in the United States for only a short period of time when he was arrested." Valdivia's declaration is silent as to his activities while in this country other than the crimes for which he was arrested. He refers to a son, yet does not disclose whether his son was born prior to Valdivia's no contest plea. Valdivia's three "community letters" refer to Valdivia's "ties to the community" without describing what those ties were. We see no evidence that at the time of his no contest plea, Valdivia had formed such deep ties to the United States

13

that he would forego a plea deal that would lead to his release the same day.

The existence of an alternative, immigration-safe plea is another factor relevant to assessing Valdivia's assertion that, properly advised, he would not have accepted his plea deal. There is no evidence in the record, other than Valdivia's uncorroborated declaration, to support his contention that Bestard failed to bargain with the prosecution for an immigration-safe plea deal. We afford little weight to a declaration the trial court found lacked credibility, written by a declarant who does not understand English and is unfamiliar with the legal system, asserting that counsel did not bargain towards an immigration-safe plea.

Valdivia's declaration alone is not enough to show that an immigration-safe plea deal was available, but Valdivia also offers a declaration by his immigration attorney. In *People v. Bautista* (2004) 115 Cal.App.4th 229, 238-240, the defendant submitted a declaration from an immigration law attorney who not only identified a specific immigration-safe charge to which the defendant might have pleaded, but informed the court that he believed the prosecution would have accepted this plea based on other cases he had handled or in which he had been consulted. Likewise, in *Vivar*, "[t]rial counsel's contemporaneous notes indicate the prosecution offered a deal under which Vivar would plead guilty to a single count of burglary [citation] with a recommendation that he serve the low term of two years in state prison," and "the uncontradicted declaration from Vivar's immigration expert stated that Vivar could've entered such a plea without subjecting himself to mandatory deportation." (*Vivar*, *supra,* 11 Cal.5th at p. 531.)

14

Valdivia's reliance on the declaration of his immigration counsel is misplaced, because nowhere in her declaration does she discuss alternative immigration-safe pleas. Valdivia's motion counsel speculates that "the District Attorney's office might have been amenable to an alternative plea agreement given the relatively small amount of drugs," without ever explaining why the prosecutor would reward Valdivia for successfully destroying most of the evidence of drug trafficking. On appeal, Valdivia suggests he might have been able to plead to first degree burglary. That, too, is mere speculation. (*People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 665 (*Abdelsalam*) ["[defendant's] counsel *now* engages in speculation that he could have pled to burglary, without any citation from the record indicating that disposition would have been entertained by the prosecutor"].) We conclude that Valdivia has not shown that an immigration-safe plea deal was available at the time he entered his no contest plea.

Still another factor is the probability of obtaining a better outcome had Valdivia gone to trial, as well as the difference between the likely outcome and the bargained-for term. Once again, Valdivia's evidence falls short. We would expect to see, at a minimum, an expert declaration setting out the likely range of outcomes for a first-time offender facing the same charges as Valdivia. Instead, the record includes the prosecutor's comment that Valdivia could expect a sentence of five years six months, as well as the court's comments that the prosecution's offers were "bottom line" and the best outcome Valdivia and his codefendants could hope to receive. At the hearing on Valdivia's motion, the trial court commented on his contemporaneous experience, when "back then an 11351.5 conviction you go to state prison for almost in one hundred percent of the cases" and "back then this was the

height of the cocaine and—heavy, heavy sentences were being handed down."

Valdivia argues on appeal that the prosecutor's case may not have been strong, but that is both speculative and unpersuasive. Valdivia's assertion that drugs on the scene were for personal use ignores the fact that sheriff's deputies were apparently ready to testify that they conducted surveillance and observed traffic consistent with trafficking, and that an undercover operative actually purchased drugs from Valdivia and his co-defendants. Valdivia's assertion that only a small amount of drugs was found invites us to forget that he and his codefendants stuffed plastic baggies filled with a white substance down a garbage disposal when deputies entered with a search warrant. The case against Valdivia does not sound weak or easily defensible. "A defendant convinced he or she is unlikely to avoid conviction thus might have few reservations about accepting a plea bargain that offers significant benefits over the probable consequences of proceeding to trial." (*Martinez, supra,* 57 Cal.4th at p. 564.)

Valdivia is also ignoring the fact he had no legal right to be in the United States in the first place. He was not facing a choice between pleading no contest and being deported, and going to trial and remaining in the United States. Valdivia's best chance to remain in the United States was to accept a plea deal providing for his release from custody that same day, a point the trial court made during oral argument. "You go to state prison. You will be deported. You have a chance if you went to county jail that immigration would not find out because he did go to county jail and immigration wasn't waiting for him." As the court explained in *Martinez*, "[t]he defendant thus must convince the

16

court he or she would have chosen to lose the benefits of the plea bargain despite the possibility or probability deportation would nonetheless follow." (*Martinez, supra,* 57 Cal.4th at p. 565.) The trial court found it not credible that Valdivia would have chosen to forego the plea bargain. We conclude the record, viewed independently, affords us no basis on which to find otherwise.

## IV.   Valdivia's Authorities Are Distinguishable

Valdivia cites a number of cases in which similar pleas were set aside based on a showing of lack of understanding. His inability to provide credible (or corroborating) evidence to support his motion shows that his circumstances differ markedly from the facts of the cases he relies on. For example, the defendant in *Espinoza* pleaded no contest in reliance on the assurance of his counsel's assistant that "if he pleaded no contest, 'everything was going to be fine.'" (*Espinoza, supra*, 14 Cal.5th at p. 318.) Espinoza's counsel never advised him about the consequences of pleading no contest. The trial court advised Espinoza that conviction "may" have adverse immigration consequences. (*Ibid.*) In *People v. Manzanilla* (2022) 80 Cal.App.5th 891, the defendant's counsel advised him that he would have an immigration hearing following his no contest plea, but not that he was virtually certain to be deported. (*Id.* at p. 898.) The defendant initialed a form stating he understood that " 'I must expect my plea of guilty or no contest will result in my deportation,' " but explained that because of a visual impairment he was unable to read the form, and only signed it based on his counsel's assurance that "it covered everything we had already talked about." (*Id.* at pp. 899, 901.) *Camacho* is also distinguishable. There, although the defendant was advised that his plea "will result" in immigration consequences, defense

17

counsel testified he advised his client that the charge *could* subject him to deportation, that he could protect his client by moving to expunge his record and reduce the charge to a misdemeanor, that he misunderstood the potential immigration consequences and the effect of expungement or reductions of felonies in immigration cases; and that he did not explore possible alternatives to pleading to an aggravated felony. (*Camacho, supra,* 32 Cal.App.5th at p. 1003.) Moreover, unlike our case, where the trial court expressly found Valdivia's declaration lacked credibility, the trial court in *Camacho* made "no express or implied credibility determination for or against defendant." (*Id.* at p. 1009.) The defendant in *People v. Ruiz* (2020) 49 Cal.App.5th 1061, 1065-1066, was advised that pleading guilty to violating Health and Safety Code section 11351.5—the same charge to which Valdivia pleaded— "may," not "will" or "would," lead to immigration consequences. Finally, the defendant in *People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1000, had negotiated what should have been an immigration-safe plea deal, but was subject to being deported when, without his knowledge, he received a longer sentence than what was agreed to.

The case most helpful to Valdivia is *Lopez.* There, the defendant was advised that his guilty plea would result in deportation and exclusion, and he initialed a *Tahl* waiver form that included a statement to that effect. Unlike our case, however, trial counsel confirmed he had discussed the *Tahl* waiver for only " 'a minute or two' " and had not discussed the immigration warning at all before Lopez initialed it. (*Lopez, supra*, 66 Cal.App.5th at p. 578.) Lopez was not assisted by an interpreter, meaning "[i]t is at best unclear that Lopez read or

understood what he was initialing." (*Ibid.*) Moreover, not all of the felony counts Lopez was charged with carried adverse immigration consequences, but counsel's lack of understanding of the immigration consequences of each charge meant he lacked knowledge to negotiate the best deal from an immigration standpoint. The Court of Appeal concluded that, had counsel known the immigration consequences of the various charges, "there is at least some possibility that he could have negotiated an immigration-neutral plea offer the prosecution was more likely to accept." (*Lopez,* at p. 565.)

Valdivia's circumstances are sufficiently distinguishable from Lopez's that we reach a different result. First, Bestard testified that at the March 20, 1996 plea hearing—which was the second plea hearing with Valdivia—he spent half an hour to 40 minutes explaining the *Tahl* waiver, and did so with the assistance of a Spanish interpreter. Thus, the reasons why the court in *Lopez* had doubts whether the defendant understood the immigration warnings he received are not present in Valdivia's case. Second, Valdivia pleaded to only one deportable charge, and while Bestard incorrectly stated that the immigration consequences of the plea were a "gray area," he nonetheless correctly informed Valdivia that a no contest plea "would" lead to deportation and exclusion. Third, while there were indications in *Lopez* that an immigration-safe plea bargain acceptable to the prosecution could have been reached, there is no similar evidence in the record before us.

After reviewing the cases cited by both sides, we believe the facts of Valdivia's case are closest to those in *Abdelsalam*. The defendant in *Abdelsalam* contended that his attorney did not explain the immigration consequences of his plea, and that he

19

would not have entered the plea had he known of those consequences. Affirming the order denying relief, the Court of Appeal stated, "During the taking of the plea, [the defendant] was told orally and in writing that he *will* be deported. Not that he 'might' be deported, or that he 'could' be deported. [The defendant's] argument that he was not aware of the mandatory nature of the deportation flies in the face of the mandatory language used to describe the likelihood of deportation. [The defendant] is not entitled to simply ignore the admonitions he was given about the consequences of the plea, and argue that he unilaterally assumed he would be treated in direct contravention of what he was advised orally and in writing." (*Abdelsalam, supra,* 73 Cal.App.5th at p. 663.)[5]

## V.     Bestard Was Not Ineffective

Valdivia asserts that Bestard's representation of him at the March 20, 1996 plea hearing was ineffective, and resulted in him

---

[5]     Following the close of briefing, Valdivia's counsel called our attention to *People v. Padron* (2025) 109 Cal.App.5th 950. There, our colleagues in Division Seven reversed an order denying a section 1473.7 motion by an asylee who pleaded no contest to carjacking. The Court of Appeal pointed to evidence that the defendant, a human rights activist from Cuba, was suffering from PTSD at the time of his plea, including his counsel's contemporaneous notes that the defendant was "still going out nuts." (*Id.* at p. 961.) In addition to evidence that the defendant was unable to understand the immigration consequences of his plea, the defendant in *Padron* submitted credible evidence of significant family ties to the United States, showing that he would not have accepted a plea deal that would result in deportation or exclusion had he been able to make an informed choice. (*Id.* at pp. 962-963.) Valdivia's evidence is not comparable in weight, character or credibility.

20

accepting a plea bargain without fully understanding the immigration consequences of that bargain. We reject out of hand Valdivia's assertions that Bestard performed incompetently by failing to advise him of the immigration consequences of his no contest plea, by failing to negotiate an immigration-safe plea, and by failing to investigate Valdivia's immigration status. We address only Valdivia's assertion he was prejudiced by Bestard's failure to investigate the immigration consequences of pleading no contest to violating Health and Safety Code section 11351.5.

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).) If so, we then consider "whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; see also *Strickland,* at p. 694 ["The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"].)

The trial court observed that Bestard was incorrect when he testified that the consequences of pleading no contest to a violation of Health and Safety Code section 11351.5 was a "gray area." Citing *People v. Soriano* (1987) 194 Cal.App.3d 1470, Valdivia insists that by failing to investigate, Bestard performed incompetently, resulting in prejudice. We are not persuaded. "By her own admission [Soriano's counsel] merely warned the defendant that his plea might have immigration consequences. Had she researched the matter she would have known that his guilty plea . . . made him deportable." (*Id.* at p. 1482.) This

21

obviously differs from the facts before us. Even if Bestard incorrectly believed the immigration consequences of a no contest plea were unclear, he advised Valdivia—correctly—that his plea would lead to deportation and exclusion. Thus, Valdivia suffered no prejudice from Bestard's misunderstanding. "When there has been no showing of prejudice, we need not determine whether trial counsel's performance was deficient." (*In re Marquez* (1992) 1 Cal.4th 584, 602.)

## DISPOSITION

We affirm the order dated June 9, 2023, denying Valdivia's motion for relief under section 1473.7.


RICHARDSON, J.

WE CONCUR:


LUI, P. J.


ASHMANN-GERST, J.